**Jacksonville Hotel Building Corporation, Defendant in Error, v. Dunlap Hotel Company, Plaintiff in Error.**

**Gen. No. 8,512.**

Opinion filed December 16, 1931.

GILLESPIE, BURKE & GILLESPIE, for plaintiff in error.

BELLATTI, SAMUELL & MORIARTY and BARBER & BARBER, for defendant in error.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

The plaintiff in error, the Dunlap Hotel Company, prosecutes this writ of error to review a decree rendered by the circuit court of Sangamon county wherein it was ordered to specifically perform the terms of a certain contract for a lease of a hotel building known as the New Dunlap Hotel in Jacksonville, Illinois. The Jacksonville Hotel Building Corporation, defendant in error, filed in the circuit court of Sangamon county a bill for the specific performance of the contract in question making E. O. and E. S. Perry of Springfield, Illinois, parties defendant to said bill. The contract sought to be enforced was executed by M. F. Dunlap acting for and upon behalf of The Jacksonville Hotel Building Company, then

in process of organization, and by E. O. and E. S. Perry who by the terms thereof could take a lease as individuals or at their option in the name of the Perry-Rigby Hotel Company, or a new hotel company to be organized by them for the purpose of operating said hotel. The plaintiff in error was organized by the Perrys in availing themselves of this option and it intervened in this proceeding as a party defendant and cross complainant.

### THE PLEADINGS

An understanding of the details of the pleadings is necessary to a full understanding of the many issues in this case.

The original bill of complaint in substance alleged that on the 11th day of June, 1924, complainant proposed and agreed in writing to lease to the defendants Perry the hotel in question when erected, and that the defendants Perry accepted said proposition in writing as shown by Exhibit "A" expressly made a part of the bill of complaint; that pursuant to the terms of the agreement the complainant purchased and acquired title to a particular site in the City of Jacksonville, Illinois, and erected thereon a hotel building approximately as shown on a certain block plan prepared by T. C. MacVicar, dated February 14, 1924, with the approximate dimensions of 185 by 88 feet, which was five stories high and approximately 120 rooms capacity; that said building was constructed along the general lines of said plans prepared by Jarvis Hunt, dated January 16, 1924, excepting the first floor which was constructed along the lines of a first floor plan prepared by the same architect dated February 6, 1924, and that the hotel corresponded approximately to the elevation plan prepared by the same architect dated February 14, 1924; that the final working plans of said hotel as to matters of detail

were approved by the said defendants; that the cost of said building, including the ground site, the new street pavement and sidewalk, was in excess of $400,000 and that under the terms of said agreement the annual rent to be reserved was $25,000 a year; that said building was completed November 30, 1925, and defendants accepted same December 1, 1925, and entered into possession thereof under said contract for lease and are now in possession pursuant to the terms thereof; that pursuant to the terms of said contract a lease was drafted and presented to said defendants for execution and that they refused either to approve or execute the same; that complainant has always been ready and willing to comply with the terms of said agreement on its part to be performed and is ready and willing to execute a lease of said premises to said defendants or to any new hotel company organized by the defendants for the purpose of operating said hotel, providing said company at the time of taking said lease has a net worth at least equal to the cost of furnishing said hotel complete and ready to operate and in keeping with the character of hotel erected.

The contract, Exhibit "A," which was made a part of the bill, is a contract between M. F. Dunlap, acting on behalf of complainant (defendant in error) then in process of organization, and the Messrs. Perry of Springfield, Illinois, and in substance provides as follows:

(1) That said building corporation will acquire a site in Jacksonville, Illinois, and erect thereon a hotel building on property either lying east of the present Dunlap House and approximately as shown on a certain block plan prepared by T. C. MacVicar dated February 14, 1924, or on the site of the present Dunlap House and approximately as shown on the block plan prepared by T. C. MacVicar dated January 16, 1924.

(2) The dimensions to be 180 feet by 88 feet and the building to be five stories high with approximately 120 to 130 rooms.

(3) The construction to be along the general lines of certain plans prepared by Jarvis Hunt dated January 16, 1924, excepting the first floor plan which is dated February 6, 1924, and corresponding approximately to the elevation plan dated February 14, 1924, with the express understanding that the final working plans, as to matters of detail should be subject to the approval of the Perrys.

(4) An offer to lease said building when constructed to the Perrys or at their option to the Perry-Rigby Hotel Company or to a new hotel company to be organized for the purpose of operating said hotel provided said new company has a net worth equal to the cost of furnishing said hotel complete and ready to operate in keeping with the character of hotel erected by the building company.

(5) The term to be 20 years from the date the building is tendered ready for occupancy.

(6) The rental to be an amount equal to 6¼ per cent of the audited cost of said property, it being agreed that such audited cost should include in addition to the cost of the building the cost of the ground site and of the new street to be opened adjacent to it as shown in the block plan including the pavement and sidewalks on both sides of said street, all necessary appurtenances of the building and the cost of and commission on a bond issue of not to exceed $200,000 and to also include taxes paid by such corporation prior to tendering said premises to lessee provided that the total cost on which the rent should be computed should not in any event exceed $400,000.

(7) The usual conditions respecting payment of taxes, special assessments, water rents, insurance, etc., covenants to keep premises safe and secure, etc., to be incorporated into said lease.

The original defendants, E. O. and E. S. Perry, answered the bill of complaint denying all of the material averments thereof and subsequently filed a cross-bill in said cause naming complainant (defendant in error), M. F. Dunlap and T. C. MacVicar, cross defendants, which cross-bill was subsequently amended to include as cross defendants J. B. French, J. B. French Company, Jarvis Hunt and Charles Bohasseck. The various cross defendants answered the cross-bill as amended and after an order of reference to the master in chancery to hear the evidence upon the original bill and cross-bill, as amended, the Dunlap Hotel Company, plaintiff in error herein, filed its intervening petition in said cause applying for leave to intervene and file its answer and cross-bill, which intervening petition was allowed. The answer of the Dunlap Hotel Company thereupon filed in pursuance of leave of court adopted the answer of the original defendants, E. O. and E. S. Perry, and also adopted their cross-bill and in substance its answer was as follows:

(1) That it is the new hotel company contemplated by the terms of said contract to be formed at the option of E. O. and E. S. Perry for the leasing and operating of said hotel building to be constructed pursuant to said contract of June 11, 1924, and that it had all the requisite requirements specified therein and that prior to the completion of said building it then being duly incorporated and authorized to do business accepted the said contract and spent about $75,000 in preparing to operate said building and that thereafter it became the occupant of and assumed the management, control and operation of said hotel. The answer denied that the complainant erected a hotel building pursuant to the terms of the contract (Exhibit "A"); that the building cost in excess of $400,000 or that an audit was submitted to the Perrys or to this defendant; that the building was completed

on or after November 30, 1925, and accepted in accordance with the terms of the contract or that taking possession thereof constituted an acceptance of the building as complete in accordance with the provisions of the contract, Exhibit "A." The answer further averred that at the time the Dunlap Hotel Company entered into possession of said building it was well known by complainant that it took possession in expectation that the hotel had been constructed in substantial compliance with the terms of the contract or would be so completed, and with the understanding that it would execute no lease until said building should be constructed and completed in substantial accordance with the terms and conditions of the contract, and that complainant well knew that said building had not been so constructed in accordance with the plans mentioned in the contract or in accordance with any details of working plans submitted to defendant or to the Perrys upon its behalf, and that the same was not complete but that the construction had been changed to make the building of less utility, use and convenience than specified in said plans and specifications and that many parts thereof were incomplete which the complainant knew and the defendant did not know; that as rapidly as facts came to its knowledge of the deficiencies of said building, it called attention of the complainant thereto and requested a compliance with the terms and conditions of said contract and on March 13, 1926, submitted to Dunlap, representing the complainant, a detailed statement pointing out the various respects in which the hotel did not comply with the terms of said contract and specified the following defects in construction: (1) nine fewer rooms; (2) rooms in building generally smaller than original plan; (3) re-enforced concrete construction of building changed to steel frame subjecting building to hazard of fire and increased maintenance; (4) roof changed from re-enforced con-

crete fireproof construction to wooden roof; (5) court walls and penthouse walls changed from brick to hollow tile; (6) stone window sills changed to brick; (7) finished hallway floor omitted; (8) shelving omitted from linen rooms and vault; (9) ash hoist, trunk lift, auxiliary boiler for live steam to kitchen, letter and key rack, cigar case, revolving doors, toilet fixtures and window screens omitted; (10) stone work on street fronts omitted; (11) flue for fireplace in lobby omitted; (12) decoration in rooms, hallways and lobby omitted; (13) tile partitions under front stairway omitted; (14) stone coping changed to tile; (15) carpet strips in hallways, doors, etc., omitted; (16) generally cheaper construction rendering the building far less efficient, more difficult to maintain, less proof against damage and injury by fire, less comfortable for guests, less attractive to the public.

The cross-bill of the Perrys which was adopted by the Dunlap Hotel Company, plaintiff in error herein, alleged the following:

(1) That the Jarvis Hunt plans mentioned in the contract were not intended by the parties to describe and did not particularly in detail describe the kind of building to be built but were intended by all parties as a general floor plan showing the general room arrangement, the general character of the building and the general outline thereof and that the details should thereafter be developed and approved in accordance with the arrangement of the parties.

(The answers of the cross defendants Jacksonville Hotel Building Corporation, M. F. Dunlap and T. C. MacVicar admit the foregoing averment and state that modified plans made by Jarvis Hunt were approved in writing October 29, 1924, by E. S. Perry and that such plans were Exhibits ''M'' and ''N,'' which were the Jarvis Hunt plans of July 28, 1924, and September 25, 1924, respectively, and were offered in evidence as complainant's exhibits 15 and 16.)

(2) That thereafter Jarvis Hunt on September 25, 1924, prepared a set of detailed working plans for the construction of such hotel as the negotiations between the parties to the contract contemplated, which were approved by the cross complainant and provided for the construction of a first class fireproof re-enforced concrete building of first class material and workmanship; that said detailed plans were the final working plans in accordance with which the building was to be erected and that no other or different plans were ever submitted to or approved by the cross complainant or any other persons acting for it for the modification of same.

(3) That it was understood that proportion between the size, character, usefulness, cost of operation and maintenance of the building and the rent to be paid by the cross complainant would be reasonable, equitable and just; that after acceptance of said proposition contained in the contract it was ascertained that no responsible bidder would undertake to build said hotel in accordance with the approved plans and specifications made a part of said contract, and that thereupon other plans and specifications were prepared and the cost of said building reduced by reducing its size, changing the character of its construction from fireproof concrete to unprotected steel and by the elimination of all of the other matters hereinabove mentioned in plaintiff in error's answer.

(4) That the said Perrys are not builders and were not at any time familiar with the changes made from the said approved detail plans, reducing the size, cost, usefulness and adaptability of said building for hotel purposes prior to an investigation made by them on behalf of plaintiff in error after it occupied said building; that no revised or changed detail plans for the construction of said building were submitted to or approved by said Perrys acting upon its behalf.

(5) That it was agreed that the Perrys, or a corporation formed by them for that purpose, should purchase and have ready for installation and use ample equipment and furnishings for the occupancy and use of said hotel building at the time of its completion and that in order to do so it was necessary to purchase and have same ready for immediate use long before said building was completed; that said Perrys acting upon behalf of plaintiff in error prior to the completion of said building had purchased approximately $65,000 worth of material, furniture and equipment and had placed same in said hotel building.

(6) That the cross complainant, in good faith, intending to carry out the spirit of the contract, made some payment on account of rent to accrue under a lease which it expected to accept after it had commenced the operation of the hotel and before the same was completed and the departures from said approved plans were brought to its knowledge, and that it is now ready, able and willing to pay a rent for the use thereof reduced from that specified in the contract in the same ratio or proportion as said building and the use and value thereof for hotel purposes has been reduced and diminished by said changes.

(7) That at the time the building was occupied by the cross complainant, it was wholly uninformed as to the extent of reductions and deficiencies and of the extent of the variance of the actual construction from the approved plans, and that at the time it entered into the building it believed and understood that it was a fireproof building and had an adequate roof; that the fifth story was capable of continuous use throughout the year; that it was constructed so as to exclude the elements of rain, sleet and snow; that the baseboards and other interior finish were of proper material and of good workmanship; that the floors were of sufficient thickness so that they would stand use without crack-

ing, and that the insurance rate upon the building would be the usual rate for fireproof buildings of like size; that when it entered the building the cross complainant assumed that the absent parts would be completed and finished in accordance with the approved plans.

(8) That the building was erected by M. F. Dunlap under the personal supervision of T. C. MacVicar acting as his agent, and that they urged it to occupy and furnish the building before completed so as to expedite the opening of the hotel; that when occupied the said MacVicar informed its agent that parts would not be completed or furnished, and that it was learned that the rate of insurance was fixed upon the classification of said building as non-fireproof; that the cross complainant, acting in good faith, accepted the representations and statements of the said MacVicar and Dunlap that said changes did not and would not affect the value, utility or adaptability of the hotel for hotel purposes; that Dunlap and MacVicar represented to the Dunlap Hotel Company that MacVicar was an expert builder and possessed peculiar knowledge of such things and was deceived and misled by said statements and representations and prevented from making any independent investigation until it was revealed that the building was not fireproof.

(9) That the cross complainant then obtained the assistance of architects and experienced builders and for the first time made investigation of the changes in the construction of said building and the deviation from the detailed plans which were approved; that the building erected materially varies from the approved plans in having a weak, unsuitable frame, thereby rendering it more expensive to maintain and increasing the fire and tornado insurance rate and rendering it liable to fall in case of fire, windstorm or earthquake, and in having a roof of wood insufficient to pro-

tect the interior and contents of the building from rain, sleet and snow so that the fifth floor of said building is unfit for hotel purposes in hot weather; that by the negotiations with Dunlap and MacVicar and the representations and statements of Dunlap and Mac-Vicar the cross complainant was led and induced to make a large investment in hotel furniture and property for the purpose of running and operating the said hotel, and that it has no other use to which said furniture could be applied, and unless continued in use in said hotel a heavy loss would be suffered as the second-hand price of it would amount to no more than 25 per cent of its actual value; that the cross complainant is ready, able and willing to operate said hotel and pay a fair and reasonable rental for the use thereof and accept a lease thereon for the term specified upon there being ascertained an equitable adjustment and accounting and that it offers to pay upon ascertainment of the same to the owner of said property or into court for the use of the owner thereof.

(10) That in order to ascertain the equitable sum to be charged as rents in accordance with the spirit and intent of said contract and to do equity and justice between the parties it will be necessary to ascertain both the cost of said building as planned by the said Jarvis Hunt and the reasonable cost of constructing the same as constructed and to take into account the unfinished parts and make proper deductions therefor; that M. F. Dunlap and T. C. MacVicar confederated together contriving how to wrong and injure the said Perrys and the said cross complainant in the premises and disregarded their duty to keep the Perrys as the parties to said contract and as the representatives of cross complainant informed as to all changes of the plans of said building which constituted a departure from the approved plans, thereby wilfully intending to deceive and mislead to the extent of said

deviations and departures and fraudulently and wilfully inducing cross complainant without knowledge of the defects and its inferiority and lack of usefulness to execute a lease based upon the assumption that said building was of equal value and usefulness with the building which should have been erected in accordance with said approved detail plans.

(11) That after the approval of the detail plans of September 25, 1924, said MacVicar and Dunlap determined to cheapen the cost of said building by the use of labor, materials and construction inferior to that shown by the approved plans by eliminating many parts, fixtures and appliances and to build said building without letting any contract therefor under the direction of the said Hunt, MacVicar and Dunlap by J. B. French Company to be built as they should from time to time direct, and that they thereupon changed and modified said plans without the consent of the Perrys acting in their own behalf or as representatives of cross complainant, well knowing that any changes made in said building of the character proposed would result in damage to the Perrys or cross complainant, whichever should become beneficiary of said contract; that the said Hunt pretended to employ the said MacVicar, in order to reduce the cost of same, employed cheaper materials and eliminated innumerable parts, necessities and conveniences which were shown by the approved plans of September 25, 1924, and eliminated same without the knowledge and consent of cross complainant; that in the construction of said building the said Hunt and MacVicar did not keep any accounts, check or control of the labor and material used or not used, nor of time wasted or unemployed nor of the use of materials and appliances purchased and provided; that no record was kept by the said MacVicar from which an audit of his accounts can accurately be made; that the actual accounts for labor and material used in

said building is far less than the nominal cost made up by the vouchers and certificates approved by the said MacVicar and certified by the said Hunt; that the rents to be paid under said contract were to be based upon the audited cost of said building to be constructed in accordance with the detail plans and specifications approved by the Perrys; that by the terms of said contract the beneficiary thereof acquired the right to have full and detailed information concerning all changes in the plans and details of construction of said building and especially of all such changes as were made subsequent to the approval of the plans of September 25, 1924; that said Dunlap and MacVicar disclaim all knowledge in relation to changes made in said plans of September 25, 1924, and it further alleged that all such matters are in the hands and subject to the control of the said Hunt and French; that the said Dunlap, MacVicar, Hunt, Bohasseck, French and French Company are co-operating and conspiring together to prevent an ascertainment of the facts in relation to said changes in construction, cost and efficiency of said building as above alleged.

The cross-bill prayed for discovery and further prayed for a dismissal of the original bill, for an equitable adjustment of the rights of the respective parties to enable cross complainant to enjoy the use of said hotel building at a rental proportionate to the value to it of a 20-year lease thereon as compared with a 20-year lease on said building had it been constructed in accordance with the original detail plans and specifications; for an accounting in the event of a decree of specific performance for all damages that had accrued to cross complainant from the failure to comply with the terms and conditions of said contract.

The Jacksonville Hotel Building Corporation answered said cross-bill by adopting its answer made to the cross-bill of the Perrys and it should be here noted

that it therein averred that no revised or changed plans for the construction of said hotel building were at any time made that were not submitted to the Perrys and approved by them and that there never were any deviations from the Jarvis Hunt plans mentioned in Exhibit "A" excepting changes that were made and submitted to the Perrys and approved by them and that no detail plan and drawings of said hotel had been made by the architect prior to Exhibit "M" but after the approval thereof, the architect prepared a detail plan to be used in building said hotel and that said detail plan conformed in all material respects to Exhibit "M"; consisted of 15 sheets and that said sheets were all dated September 25, 1924, and that blue prints were made of said detail plans one of which was filed as cross defendant's Exhibit "N"; that E. S. Perry obtained a copy of Exhibit "N" on October 27, 1924, from the office of Jarvis Hunt and after examining same on October 29, 1924, approved the same in writing, a copy of which written approval was filed as cross defendant's Exhibit "O."

The answer of M. F. Dunlap to the cross-bill also stated that the hotel was built along the general lines of the plans referred to in Exhibit "A" as afterwards changed by express agreement with the Perrys and that the final working plans of September 25, 1924, for said hotel as to matters of detail were approved by the Perrys.

The answer of MacVicar to the cross-bill alleged that no revised or changed plans for the construction of the hotel building were at any time made that were not submitted to the Perrys and approved by them and that said hotel was constructed according to the detail plans of September 25, 1924, which were submitted to and approved by the Perrys.

The answer of Jarvis Hunt and Charles Bohasseck to said cross-bill alleged that the first completed set

of plans are dated September 25, 1924, and changes and variations from said completed plans are shown by plans dated January 25, 1925, and subsequent dates; that all instructions were received by them from the said Dunlap and MacVicar; that bids were taken on the plans dated September 25, 1924, and exceeded the maximum amount specified by Dunlap and that it became necessary to reduce the cost and that to accomplish this result J. B. French, the best bidder, was called in and after discussion it was agreed that he should proceed with the building with certain changes to be worked out by Hunt and Bohasseck and that such changes are shown on the plans dated January 23, 1925.

## THE DECREE

The decree rendered in this case by the circuit court of Sangamon county dismissed the original bill as against the defendants E. O. and E. S. Perry and decreed a specific performance of the contract (Exhibit "A") by the Dunlap Hotel Company, plaintiff in error, and ordered the Dunlap Hotel Company to execute a lease containing substantially the provisions of the lease marked Exhibit "B" which was appended to the original bill of complaint. The decree dismissed the cross-bill of the defendants Perry but made no disposition of the cross-bill of the defendant Dunlap Hotel Company (plaintiff in error). The court found in its decree the following upon which error has been assigned by plaintiff in error:

(1) That the plans of September 25, 1924 (Exhibit "N" or 16) never became a part of the original contract of June 11, 1924 (Exhibit "A"). (Dunlap's answer admits that they did become a part of the contract.)

(2) That the Dunlap Hotel Company knew that said hotel building was not being erected in compliance with the working plans of September 25, 1924.

(3) That the Dunlap Hotel Company in its objections pointed out defects to the complainant (defendant in error) which were obvious and plain to view prior to the taking of possession of said building by said plaintiff in error with full knowledge of defects claimed to exist in the structure and that such taking of possession amounted in law to an approval of the plans, both general and in detail, as well as the material and workmanship that went into the structure.

(4) That the audited cost of said building and premises was computed in accordance with such contract and is in excess of the sum of $400,000 and that there was no fraud in connection with any of the charges or items of cost and that $400,000 should be taken as the basis for the rental charge to be reserved in the lease.

(5) That there had been an audit of the cost of said hotel building and premises.

### THE AUDIT

Jarvis Hunt, the architect who drew the plans and was paid $18,000 for such work, testified: MacVicar's duties were superintending the job. This superintendent represented the architect and the owner. I don't know what the duties of the superintendent are specifically. I don't know whether it is his duty to take and keep an account of the material that goes into the building or to keep an account of the labor that goes into the building or make reports to anyone of what material is received or to make report of the labor that goes into the building or to make a report of the materials that are brought on the ground and not used in the building. I refer you to Mr. Bohasseck. I had no experience except to pass the buck. I must have modified the plans innumerable times. The building was being built for a company. I don't know whether it was organized or not. I dealt with Mr. Dunlap.

Hunt's aid, Charles Bohasseck, testified as follows: MacVicar was boss on the location. He represented both sides. We paid him $250 a month in 13 payments. We got a total amount. of $18,803.76. The plan for keeping track of the materials used in the place was entirely up to Mr. MacVicar. When a contractor applies for a payment on account he makes an application, says he has done so much work, we investigate it. Mr. MacVicar on this particular job gave his report on how much work was done. We estimated the value of this work in our office and we found it correct and in general accord with his application. We gave him the full amount. If we didn't, we gave him what we thought was coming to him.

Mr. French had a material clerk on the job, a time keeper and a general superintendent. Mr. MacVicar would get all his information from them. I don't know whether there was an account kept of all unused material or not.

Mr. MacVicar who had been connected with the Dunlap Bank for several years and who was paid $250 a month for superintending the work for the architect and the owner, testified: I kept no record or check of the material that went into the building. We kept a check on the hours of labor that went into the building, by the method that was used in the architect's office. About once every two or three days we would get the superintendents of the various branches of the work and ask them how many men they had working. We would check that up and find just what they told us virtually was true by counting the men. We would then report those facts to our office. We kept no check ourselves on the actual cost of labor. There were three contractors on the building and about six or seven subcontractors. I passed the material, inspected the material, saw them work. I passed the material by submitting samples to Jarvis Hunt for approval.

I submitted a sample of brick and the brick did not have any holes.

MacVicar occasionally had to go to Chicago to see Hunt, the architect, and his expense bills show over $100 for theater tickets for which he was paid, upon which amount plaintiff in error is decreed to pay 6¼ per cent rent for a period of 20 years. The contractor was James B. French, who, in the final analysis, constructed the building on the cost plus plan. His original bid was $283,130 in which there was a fee for his profit of $20,000. Later the structure was cut down and French guaranteed a saving of $23,239. There was never any contract signed, but it was understood he was to have a profit of $20,000 and a share in the deductions. All that could be obtained from French as to checking material and labor was the following testimony: I transacted business on the ground with my superintendent, Art Nelson, and Mr. MacVicar. Our records show that the invoices or bills accompanied the material. It is checked by the superintendent and notation is supposed to be made on the back of the daily report as to quantities. The owner as a rule inspects everything and no doubt he did. Personally I wasn't there.

Plaintiff in error employed an accountant, one George G. Larrison, to make an audit of the cost of the hotel. He testifies to his efforts as follows: I was employed to make a complete audit of the Dunlap Hotel property. I went to Jacksonville on March 21 and 22, 1927, for that purpose. I saw Mr. Dunlap and told him that I was there for that purpose and to complete the audit I required various documents, contracts, books of record, etc., and certain of those things were located, but not all of them. The land contracts I believe were all located, the paving contract, the plastering contract. There was no general contract covering the contract with the general contractor, and

there was no contract with the architect covering his services. I did not find any vouchers or anything of that sort supporting the payments that had been made but was told that some of the bills were on hand but they could be all available, and that some were in Chicago but they could be brought back to Jacksonville. They were never assembled and brought back to Jacksonville. I also asked Mr. Dunlap for a letter to the contractor and to the architect authorizing them to give access to any and all records for the purpose of completing the audit but that was not forthcoming. I made an audit at that time; it was an incomplete audit. I made an effort to obtain access to these papers, vouchers, etc., and I was asked to see Mr. French and Mr. Hunt and Mr. Bohasseck for the purpose of taking out specific questions which were given me and I was unsuccessful in my efforts to see them or to reach them. I did reach Mr. French on the telephone on one or two occasions but it never did lead to an interview.

The only information plaintiff in error ever obtained as to the cost of the hotel building and grounds was through the testimony of W. J. Hauck, an employee of the Dunlap bank and treasurer of the Jacksonville Hotel Building Corporation, defendant in error, who produced 83 vouchers and testified as follows: I wrote checks for the bills that were presented, which represents the cost of the hotel, at the request of Mr. M. F. Dunlap. I don't know anything about what all the bills were for. I do know what some of the bills were for but not all of them. The vouchers were approved by the architect. I paid the architect also but do not know anything about his outside bills. I only paid Mr. MacVicar's accounts when he represented Mr. Dunlap and I wrote a check out for the amount of his bill. I knew it had theater tickets on it but did not have any business asking questions. I included that

in my audit and cost of this hotel. I have worked for Mr. Dunlap about 12 years and I am assistant cashier of the Ayers National Bank.

Counsel for defendant in error at all times refused to admit that plaintiff in error was entitled to have an auditor examine the books, papers and vouchers of the building corporation and that he was interested in the cost prices, under the issues in the case, and it is enlightening to read the finding of the learned chancellor upon this subject incorporated in the record. He holds: "The contract provides that 'said lease to be at a yearly rental of an amount equal to six and one-fourth per cent on the audited cost of said leased property' and further provides that items of cost shall be included. Naturally the builders wanted the best structure possible for the money paid; the lessees were likewise interested, because the cost was the basis for the rent. The proof in this record as to the cost of the building is not entirely satisfactory. The neglect to check the materials and labor on the part of the superintendent was inexcusable. However, there is no evidence of fraud or even suspicious circumstances attaching to the charges or various items of cost, unless it would be as to the theater tickets. It is incomprehensible how such a charge could be used as the basis of rent at 6¼ per cent over a period of 20 years. The cost of this building has not been audited within the strict meaning of that word."

The undisputed testimony of practical architects is in the record, showing what a checking and auditing system in connection with such a structure consists of, namely: "In our experience with various contractors, our accounting methods are as follows: First, there is a material checker, depending on the size of the job. He signs a slip and gives the man who delivered the material a receipt and he keeps his copy and gives it to the job's auditor, who audits the amount and sees

whether the extensions are correct and whether the rate of the charge is correct and then he approves it from an accounting standpoint. The contractor's superintendent on the job then approves the entire item and it must then be approved by the architect or his representative on the job, and after that the owner or his representative approves the entire transaction and that acts as a check and a voucher and is paid out of a separate account that is kept for that purpose. The labor is checked daily or twice daily and sometimes hourly, depending on the size of the job and number of men employed, and ordinarily at the end of a week the labor pay roll is made out and is approved by the various parties on the job. I would consider it would be a very difficult thing for the auditor to do other than that, in order to verify the various changes unless some system as that was kept. In my business practice, such a system as described by me is quite necessary. The above system is necessary to know the exact cost and make an audit possible when the job is finished.''

In this case there has been no audit had and no checking of material or labor so that an audit could be had. W. H. Franklin, an engineer and contractor of Springfield, made a very careful examination of the building as erected, and the cost of the erection of the building under the plans and specifications of September 25, 1924. He testified that the hotel building, under the plans and specifications of September 25, 1924, as of the time built, exclusive of land costs, should cost $343,216, and that the building as erected, as of the time built, should have cost, exclusive of the land, not over $276,425. This testimony is not contradicted except by the unchecked, unaudited and implied purchases of defendant in error. This proof may not establish an actual fraud. Neither does it establish an honest transaction.

## THE CONTRACT

The plans of January 16 and February 6, 1924, were mere general outlines of how the building would sit upon the ground, the elevation of the first floor, and contained nothing as to the material, or the plan of the hotel building. Under the contract, "Exhibit A," the "final working plans as to matters of detail should be subject to the approval of the Perrys." The set of plans dated September 25, 1924, are the working plans approved by E. S. Perry after going over them with the architect and described by T. C. MacVicar as plans for a first class fireproof construction, with re-enforced concrete walls and re-enforced concrete roof; also described by W. H. Franklin, an experienced civil engineer, as plans for a first class fireproof hotel providing for a first class re-enforced concrete construction with concrete roof, brick court walls, and showing a flue for the fireplace in the lobby; and similarly described by George H. Helme, an architect of 20 years' experience in and about central Illinois, as a first class re-enforced concrete wall bearing job with walls of a thickness to support the floors resting upon them with brick court walls and an exterior of brick trimmed with stone with concrete roof, a flue for the fireplace in the lobby, and a one-inch finish on top of the concrete sub-floor throughout; also described by J. B. French, the contractor who built the hotel for the complainant, as a set of plans for a first class fireproof concrete construction building.

These plans are known as Exhibit "N" and consist of 15 sheets dated September 25, 1924. The sheets are in the form of blue prints. As to these plans the learned chancellor held: "Defendants assert that upon the approval of the plans of September 25, 1924, they became a part of the contract of June 11, 1924, but with that view the court does not agree. The complainant was limited as to building funds. To say that

it would be bound to build according to plans submitted by the architect and agreed to by lessees, before it was known that the cost of the completed structure would exceed the moneys available, would be to apply a rule which might frequently, and would in this case, work an injustice and especially when neither the owner, architect nor lessees could know with certainty in advance of the bidding what the cost might be. We must treat the plans prepared by the architect and approved by the owner and submitted to lessees as a part of the contract and binding only in the event that the building when completed does not exceed in amount the money known by both parties to be available for building purposes. Otherwise, the owner would be forced to call for bids before entering into a contract of leasing and the right to approve the plans would thereby be lost to the lessees. In the very nature of the business those plans were only tentative until bids were had and accepted and these parties must have so considered it. Thus the September 25, 1924, plans never became a part of the contract. Under this state of facts, how can specific performance be decreed against the Perrys?"

Nevertheless, the chancellor is not able to find any other set of plans which the Perrys did approve, and both of the Perrys testify that before the execution of the contract Dunlap told them that he was willing to take the building project upon his own shoulders and see that Jacksonville had a first class, fireproof hotel building. Regardless of the findings of the chancellor, the cross defendants M. F. Dunlap and T. C. MacVicar answered under oath to interrogatories that the plans and specifications of September 25, 1924, were made by Jarvis Hunt, as modified plans, and that such changed and modified plans were submitted to the cross complainants and approved by them in writing on the 24th day of October, 1924, and that such modi-

fied plans were filed with the answer of the defendant in error and marked cross defendants' exhibits "M" and "N" and that cross complainants' written approval was filed with said answer, so that it is a matter of record that said plans and specifications of September 25, 1924, are the plans and specifications agreed upon by both parties to the contract, "Exhibit A," of June 11, 1924, and under these plans and specifications the Perrys assumed the hotel building would be constructed. Not only this, but MacVicar testifies that this set of plans was the only set of plans agreed upon between the parties, and were the plans upon which the hotel building was constructed and upon which the bids were based. There are no other plans in this record after October 29, 1924, which were ever submitted to either of the Perrys, or of which they or either of them had any notice. We must hold as a matter of fact that these plans and specifications of September 25, 1924, were agreed to by both parties and became a part of the contract "Exhibit A" of June 11, 1924, and made that a binding contract between the parties to this suit. If it may be urged that there was a building fund of only $400,000, and that the hotel building could not be constructed within the limits of the fund at hand, then it became the duty of either party to the contract, who ascertained that fact, to call it to the attention of the other party, and either permit him to proceed with the means at hand, with his own funds, or to declare the contract void, as impossible of performance. This, Dunlap or the defendant in error did not do, but now claims to have changed the contract, deleted necessities, built with cheaper construction and changed the entire nature of the building, and at no time notified the Perrys of the change in the work. These plans of September 25, 1924, which are conclusively established as the approved working plans under the terms of the contract, show a hotel building of first class fireproof

construction of re-enforced concrete with a re-enforced concrete roof. The plans further contemplate brick court walls, a flue for the fireplace in the lobby, a one-inch finish on top of the concrete sub-floor throughout, a wall bearing job with walls of a thickness to support the floors resting upon them, and an exterior of brick trimmed with stone. It is the contention of plaintiff in error that in addition to the express provisions of the contract there were implied provisions which obligated the defendant in error to let the bids for the construction of the building upon a competitive basis and to construct the building in the usual and customary workmanlike manner by the employment of the usual overseers, superintendents and subordinates necessary to check the labor and materials that went into the construction of the building and to see that they were all accounted for and properly credited; to preserve records so that the audited cost of the building could properly be ascertained. W. H. Franklin, a civil engineer and builder of wide experience, and George Helme, an experienced architect in central Illinois, conclusively establish by their testimony that the usual methods employed by architects and their employees in supervising construction is to check the material as it comes to the job on a delivery ticket and to later check the delivery tickets against the invoices and, after approval by the contractor on the job, to submit the item to the architect or his representative for approval; that labor is always checked daily and at the end of the week the labor pay roll is made out and approved by the superintendent, the contractor, the architect's representative and the owner; that it is the approved practice to do this in order to ascertain the exact cost and to make an audit possible when the job is completed. Five experienced hotel men uniformly testified that in the construction of a complete hotel for occupancy by tenants, it was customary, usual

and essential to provide a live steam boiler for kitchen, screens, shelving, hooks in closets, stoker for furnace, key and letter rack, and carpet strips, together with complete decoration of the building.

With the foregoing evidence showing conclusively the original intent and purposes of the parties to the contract and the obligations imposed thereunder, M. F. Dunlap and the corporation formed by him proceeded at once to build a hotel building according to their own ideas and without reference to the obligations imposed upon them by the contract or the rights of the proposed lessee. Upon the completion of the plans of September 25, 1924, bids were requested by the architect from three contractors. Dunlap, MacVicar and Jarvis Hunt by their testimony admit that they know nothing about the letting of the contract.

Bohasseck testified that they were all present but they disclaim any knowledge of what happened. Bohasseck further testified that all of the bids submitted ran too high and that J. B. French, the lowest bidder, was invited to come in for a conference and that they discussed the ways and means of reducing the cost and that French made suggestions as to how cuts could be made and the cost reduced and that thereafter the first deductions were made in the revised plans of January 23, 1925; that after the changes discussed with French were incorporated in the plans of January 23, 1925, the revolving door was eliminated, the flue for the fireplace in the lobby was abandoned and the roof was changed from re-enforced concrete to wood. French testified that his original price was $283,130 and that savings of $23,239 were effected; that terra cotta was substituted for stone, tile coping for stone coping, structural steel re-design for re-enforced concrete; that plaster and waterproofing in certain portions of the basement were omitted; that there was never a contract drawn up. Charles Bohasseck in a

letter dated December 13, 1924, to T. C. MacVicar very well expressed the view of the architect respecting the building finally agreed upon and after all of the foregoing substitutions and deductions were made by saying "the building is cut to the marrow now." Dunlap and MacVicar admit by their testimony that no revisions or changes of plans or specifications were submitted to the Perrys, and Bohasseck testifies that at no time did he consult the Perrys with reference to these changes in the bids. The record clearly indicates that there was no usual or ordinary method applied in securing bids upon a competitive basis but that a private arrangement was made between Bohasseck and French and that without any contract whatsoever French proceeded to construct the building leaving out of it all of the deductions above enumerated and this with the acquiescence of Dunlap. In the supervision of the construction of the building MacVicar, the only man in authority on the job, testified that he did not think it would be to the Perrys' interest to know of the changes in the plans and that he did not tell them; that he did not keep a record or check of the material that went into the building; that he did not know whether anybody kept a check upon material used or not used; that about once every two or three days they would get the superintendent and ask him how many men he had working and that he would then count them and report to Hunt's office; that he did not know how many subcontractors they had; that he submitted samples of material to Hunt's office for approval but did not recall what he submitted; that he was supervising all of the contractors on the job and received instructions from Hunt's office on how to handle the job but never received instructions to check the labor or material; that architect's certificates were issued by Hunt's office upon reports made by him but that he did not remember what kind they were or what

they contained; that he disposed of material left over when the building was completed by permitting people to take it from the site and by using it for kindling wood and floor joists in, a house he was building.

The roof of the building was changed from concrete to wood and leaks. The walls were changed from re-enforced concrete to structural steel and engineers express grave fears that the structure will not carry the load. The building is not fireproof, which adds materially to the insurance rate and injures the trade of the hotel. The walls of the building as shown by the approved working plans and the building actually built were changed from brick of varying thickness of several feet to hollow tile of a uniform thickness of one foot one inch. In the language of MacVicar "the details of the construction are not in any way similar. The details of Exhibit 'N' and the building as built are entirely different." The flue for the fireplace in the lobby in the approved plans was omitted when the building was built thus making the fireplace in the lobby a mere dummy. The floors which by the approved plans were provided with a one-inch finish were actually finished with the slab leaving the top finish off. The high pressure boiler provided in the plans shown E. S. Perry was eliminated, as well as the letter and key rack, marble counter, glass cigar case mounted on marble counter and linoleum upon the floors behind the counters and in the offices. The window sills were merely stained, the walls upstairs were not finished, the woodwork was thinly finished, lacking two or three coats of enamel, the dining room was given one flat coat of paint, the rooms were not decorated and the lobby lacked all of the customary decorations in a hotel of that character.

Defendant in error concedes that substantially all of these changes were made, but seeks to minimize the injury. No one claims that the contract was carried

out as agreed upon, but defendant in error insists that a hotel building was constructed which the Perrys visited and saw at various times and that it constitutes a substantial compliance with the contract. In the late fall of 1925, the hotel building appeared to be nearing completion and all parties seemed anxious to have it opened before the holidays. In October, 1925, the Perrys caused the plaintiff in error, the Dunlap Hotel Company, to be incorporated and commenced buying equipment with which to furnish the hotel. Neither Edward S. Perry nor E. O. Perry were engineers or builders and from their testimony and the proofs in this case had no knowledge of the change of plans in the construction of the building. Defendant in error notified plaintiffs in error that the building would be ready for occupancy on November 30, 1925. Plaintiff in error moved into the building on December 1, 1925, before the building was completed. There was some talk about remitting one-half of a month's rent for some time and upon March 1, 1926, plaintiff in error paid one and one-half month's rent on the basis of interest on $400,000 but it was agreed by all parties that the cost of the building was not then known. No lease was ever signed by the Perrys or by plaintiff in error. On the organization of plaintiff in error the two Perrys and Gertrude S. Perry were the stockholders in the corporation. On January 9, 1926, S. W. Straus acquired a financial interest in the corporation and became a director, taking over the interest of Gertrude S. Perry. The record does not show the various corporate interests of these parties in plaintiff in error.

It is of interest to consider the findings of the chancellor in this case and the basis of equity upon which the decree is predicated. We have cited the findings upon which the chancellor holds that specific performance cannot be decreed against the Perrys. The chancellor then holds further: ''There is only one possible

contention left for the doing of it, and that is that both the Perrys were present from time to time as the building went up and saw or could have seen the plan of construction and the materials used. This record is devoid of any proof that the Perrys knew that the bids were rejected and that a revision of the plans was contemplated or made. Under this state of facts they had the right to stand by and watch the building rise and reserve the right to accept or reject it when completed and tendered. In the view the court takes of this case the building was never tendered to or accepted by the Perrys. Furthermore complainant is not in a position to ask that the Perrys be required to execute the lease for said hotel for the reason that it has permitted another party, the Dunlap Hotel Company, to take possession of said hotel, furnish it at great cost and operate it and accept from it and retain a large sum of money as rent. The prayer for specific performance against and by the Perrys must be denied and the bill dismissed for want of equity.''

If it be conceded that the Perrys and the Dunlap Hotel Company are two separate entities, as the chancellor holds, then plaintiff in error, the Dunlap Hotel Company, never had any contract with the complainant to lease the building for any term, but it is a mere intruder.

The learned chancellor further held: ''The working plans of date, September 25, 1924, were submitted to and approved by the Perrys as an entirety. This being the reasonable construction and the one adopted by the parties this is the one that will be adopted by the court. Nor does this mean that the Perrys had the right to dictate the plan of structure or decide on the materials that should be used,—those were ultimate rights of the owner and if the Perrys could not or would not give their approval to the plans or materials selected by the owner, then the contract thereby failed of completion. The Perrys were free to approve

or disapprove and were not required to give any reason for their action.''

It therefore appears to be the view of the chancellor, the same as the view of this court, that the plans and specifications of September 25, 1924, were adopted and formed a part of the contract ''Exhibit A,'' but the chancellor holds that the building was not constructed in accordance with said plans and specifications, because there were not sufficient funds to carry out the project under said plans which rendered the contract void as to the Perrys, and specific performance could not be enforced against them.

All differences between Edward S. and E. O. Perry on the one hand, and defendant in error, the Jacksonville Hotel Building Corporation in connection with this contract, on the other hand, have been finally disposed of by the terms of the decree below, from which neither party has appealed nor sought a writ of error. The chancellor's grounds for holding plaintiff in error subject to specific performance are as follows: ''The court holds under the proof in this record that the Perrys knew, and as a consequence the Dunlap Hotel Company knew, that the building was not being erected in compliance with the working plans of September 25, 1924. No word of protest was heard and the building arose to completion. Immediately the Dunlap Hotel Company entered into possession and installed furniture and equipment at great cost without a word of objection that the building did not comply with the contract or was in anywise unsatisfactory to it.

''Prior to the time of taking possession of the hotel, the Dunlap Hotel Company was not bound by the contract of June 11, 1924, but the very act of voluntarily taking possession, without objection and with knowledge of the facts in the absence of fraud, amounted in the law to an approval of the plans, both general and in detail, as well as the material and workmanship that

went into the structure. That is the time when the Dunlap Hotel Company approved the revised plans of January 23, 1925. Then and not before was there a binding contract between the parties. Up to that time neither party could have required specific performance of the other; after that, the owner of the building having performed, by constructing the building which was accepted, left the only one against whom specific performance could be decreed,—namely, the lessee in possession,—the Dunlap Hotel Company. Before December 1st, the Dunlap Hotel Company could have ignored the contract without becoming liable in damages; or when the completed building was tendered, it had the right and could have made the 15 objections which were later contained in the letter and thereby put an end to the contract. On the contrary it took possession without objection, thereby approving the building and by so doing became liable under the contract.''

We have quoted freely from the findings of fact of the chancellor inasmuch as he heard a portion of the testimony and saw the witnesses, and in the most of his findings of fact we concur. The one contradiction as to the knowledge of the Perrys in the later findings is doubtless a clerical error. In other words, it seems to be held as to the Perrys that because there was not sufficient funds to build the hotel building, the contract is void and unenforceable; but plaintiff in error, having no knowledge except such as the Perrys had,—and as to them ''*the record* being devoid of any proof that they knew that the bids were rejected and that a revision of the plans was contemplated or made,''—and having purchased equipment and moved in, and without having signed any lease, and having undertaken to pay the rent, is subject to specific performance for 20 years. As to their knowledge, Edward S. Perry testified: At the time we went into the building, we did not know the walls as shown by Exhibit ''N'' had been

reduced in thickness, nor that the floors had been decreased in thickness. I did not know that a tile wall would affect the insurance rate. I did not know that the building would leak into the basement or that water would blow through the walls of the areaway through the tile, or that there was no insulation in the roof that would properly protect it so that the rooms on the upper floor could be used in hot weather. I suggested that on account of minor things not being completed about the hotel and the fact that we were moving in, our rental should not start until December 15 and asked for the lease. Dunlap said the lease was not ready. He further testified that he knew little about constructive building and that,—at the time payment of some rent was made I did not have knowledge of defects in this building, to which my attention has now been called. It was a payment showing our good faith.

E. O. Perry was absent from Illinois during the summers of 1924 and 1925. When he got back in the fall of 1925 he went over to Jacksonville and discovered the wooden roof and he testifies: Mr. Dunlap called on me at the Leland Hotel in Springfield. I told him I thought it was a shame to open a hotel with no decorations. I said even the dining room has marks of carpenters' and painters' hands and it looks cold and we bought a lot of fine furniture for it and we have nothing to match it. He commenced to switch me off on trouble he was having with the stockholders. I wanted him to decorate the dining room, not redecorate it. I think he did the side walls in the hotel and let the ceiling go. He came into my office and called on me. I talked about all the decorations—the whole house. There were no rooms decorated. Nothing was decorated. I didn't know about the thickness of the walls. I did not know about them until I had an expert go over and find out. I did not know that the thickness

of the floors had been reduced. I did not know that water would blow through the tile wall when it rained on that side of the building. The floors cracked after the hotel opened and I found the cause; there wasn't proper thickness of cement.

Neither of the Perrys was an engineer, carpenter or builder. They apparently knew a good and substantial hotel building when completed and occupied. Mac-Vicar states that the Perrys never discussed with him the details of construction. There is no contradiction to the facts in this case. MacVicar testified: There was to be a fireplace in the building but we have a dummy without any chimney. According to the drawing there was to be stone to the second floor and the balance up to the top was to be of brick. There was to be a stone coping on the very top of the building but they have concrete. About 120 rooms were originally contemplated in this building. There are only 111 rooms in the building. The original plan was to be about 180 feet and the present building measures about 175 feet. The width was to be about 80 feet. The original set of plans show the building is 88 feet wide.

He further testified: I can read plans and tell what is on them. Exhibit "N" shows a first class fireproof construction. That is the kind of building that was constructed indicated on those drawings, but not as to re-enforced concrete. The building constructed is not a fireproof building, and I know it isn't. The plan shows a re-enforced concrete wall. Exhibit "N" shows a re-enforced concrete roof, the building that is built has a wooden roof. The details of Exhibit "N" and the building as built are entirely different.

The hotel building never has been built or constructed in accordance with the contract. The insurance rates are more than double what they would have been under the construction contracted for. That the

Perrys were absolutely misled in this whole affair is potent from their advertising the hotel as a fireproof building in violation of the law of the State, all of which Dunlap knew and made no objection. Numerous hotel owners in central Illinois operating establishments in similar sized towns, testified that this hotel did not have a rental value in excess of $1,200 per month. The point is stressed that a hotel building of such size and dimensions must be fireproof to gain any popularity and to operate economically. The net loss in the first year's operation of the building was $21,286.32.

The court below did not pass upon plaintiff in error's cross-bill, but held plaintiff in error should specifically perform the lease which it had never signed because it had entered into the possession of the property.

Defendant in error contends that the acceptance of the building without objection, when tendered as completed, waived all objections now urged by plaintiff in error to executing the lease and carrying out the contract, citing *Lohr Bottling Co. v. Ferguson,* 223 Ill. 88; *Miller v. Gordon,* 296 Ill. 346; *Gibson v. Brown,* 214 Ill. 330; and *Ohio & Mississippi Ry. Co. v. McCarthy,* 96 U. S. 258. We cannot agree with this contention and the facts set out in the cases cited have no applicability to the facts in the case at bar. In *Lohr Bottling Co. v. Ferguson, supra,* the court held: ''Appellee contends, and the contention is supported by the evidence and the finding of the Appellate Court, that even if appellant's construction of this clause of the contract be granted, appellant had waived its right to raise that question by its unconditional denial of liability on other grounds. There can be no doubt of the rule that a party having a right to insist upon a condition precedent to the payment of money or other performance on his part will waive the condition

precedent by a total denial of liability or by placing his refusal to perform on other grounds. This rule has often been applied to contracts of insurance; but it is a salutary and well established rule of the common law, the application of which to all contracts will effect justice and cut off subsequently discovered excuses for the violation of contract engagements.''

Upon this subject Dunlap testified: At the time Mr. Perry came to see me in reference to the rent commencing the 15th of December he asked me if I wished to have them pay rent at that time and I told him it wasn't necessary as the rent would be based upon the entire cost of the building and that it could be deferred until we ascertained just what the cost was, notwithstanding the contract provided that they should pay the rent monthly in advance. I told him we had some of the smaller bills in, for the street pavement, which was outside of the regular cost of construction of the building, although it was provided for in the contract.

On the same subject Perry testified: He said the cost of the building was unknown and he wasn't in a position to say what it was, although he was very sure it was over $400,000. There has never been any audit of the cost of that building. After the suit was brought we attempted to obtain an agreement and arrangement with the complainant or with Mr. Dunlap, as its representative, to obtain an audit of the cost of the building. I have never been able to obtain on our own account an audit of the cost, nor has any audit ever been made.

The audit was as much a part of the contract as any other provision it contained and defendant in error was not in a position to claim a completed contract until an audit was made. Nothing was said in that conversation, by either party, other than that because plaintiff in error could not take possession before December 15, the rent should not start before that date.

Defendant in error had not completed the contract and there was not an acceptance of either the building or the contract.

The waiver contended for by defendant in error in this case cannot be sustained. Defendant in error grounded its bill upon a completed contract and did not claim a waiver. Defendant in error cannot make one case by its bill and another by its proof. (*Lang v. Metzger*, 206 Ill. 475, 488; *Schmitt v. Weber*, 239 Ill. 377; *Veach v. Stegmeyer*, 233 Ill. App. 559, 564; *Johnson v. Voudrie*, 233 Ill. App. 572.)

In *Lang v. Metzger, supra,* the court held: "It is a fundamental rule of equity pleading that the allegations of a bill, the proof and the decree must correspond, and that the decree cannot give relief that facts disclosed by the evidence would warrant where there are no averments in the bill to which the evidence can apply, and that if the evidence disproves the case made by the bill the complainant cannot be given a decree upon other grounds disclosed by the proofs, unless the court permits the complainant to amend his bill so as to present the case disclosed by the evidence. (*McKay v. Bissett*, 5 Gilm. 499; *Morgan v. Smith*, 11 Ill. 194; *Bremer v. Canal Co.*, 123 Ill. 104; *White v. Morrison*, 11 Ill. 361; *Rowan v. Bowles*, 21 Ill. 16; *Russell v. Connors*, 140 Ill. 660; *Reed v. Reed*, 135 Ill. 482; *Dorn v. Geuder*, 171 Ill. 362.)"

It has been further held: "The waiver estops the party not in default from claiming that the contract is ended, but it does not prevent a recovery of damages for defective work unless the right is lost by the conduct of the party not in default. . . . It is essential to a valid waiver that the party sought to be charged with the waiver had knowledge of what the other party had done contrary to the terms of the contract and what part thereof he had failed to perform. Mere silence after notice will not always work a waiver. . . . Furthermore the waiver to be effectual must not be induced by fraud, deception or threats." 3 Elliott

on Contracts, sec. 2050, pp. 236, 237. A waiver must not be induced by fraud or deception. "To constitute a waiver within the definitions already given, it is essential that there be an existing right, benefit or advantage; a knowledge actual or constructive of its existence, and an intention to relinquish it. No man can be bound by a waiver of his rights, unless such waiver is distinctly made, with full knowledge of the rights which he intends to waive; and the fact that he knows his rights and intends to waive them must plainly appear. A waiver may be express or implied, but in the absence of an express agreement a waiver will not be presumed or implied contrary to the intention of the party whose rights would be injuriously affected thereby, unless by his conduct the opposite party has been misled, to his prejudice, into the honest belief that such waiver was intended or consented to. To make out a case of waiver of a legal right there must be a clear, unequivocal and decisive act of the party showing such a purpose or acts amounting to an estoppel on his part. A waiver to be operative must be supported by an agreement founded on' a valuable consideration, or the act relied on as a waiver must be such as to estop a party from insisting on performance of the contract or forfeiture of the condition." 27 R. C. L., sec. 5, p. 908.

"The waiver may be express or it may consist in acts whereby the party shows an intention to adopt the contract or whereby he claims and enjoys in whole or in part the benefits which it confers. Such acts however in order to constitute a waiver must be done with a full knowledge of all the facts; for a person cannot be held to have waived by his conduct a fraud of which he was at the time wholly ignorant." Pomeroy's Specific Performance of Contracts, 3rd Ed., par. 279, p. 641.

The party claiming a waiver has the burden of proving it. "A presumption of the relinquishment of a known right cannot be rested on a presumption that

such right was known. A waiver must be clearly proved, . . . " 27 R. C. L., sec. 6, p. 910.

In *Stephens v. Clark*, 305 Ill. 408, 414, it is held: "The rule requiring a vendee, where he has the opportunity, to use reasonable care in inspection for his own protection, is not applied as strictly in suits in equity as in actions at law, especially in suits for specific performance. A vendee cannot be charged with negligence in relying on false statements of the vendor as to material facts which the vendor knows to be false and which he intends shall be believed and relied on. A party who is guilty of fraudulent conduct whereby he induces another to act will not be allowed to impute negligence to the latter against his own deliberate fraud. The party guilty of the fraud will not·be permitted by a court of equity to benefit by it."

In 5 Page on Contracts, sec. 3045, p. 5379, it is held: "Free choice of party not in default essential. If the conduct of the party who is not in default in accepting benefits under the contract, is relied upon as waiver of breach thereof, such acceptance cannot be regarded as amounting to a waiver unless the party who is not in default has a choice between accepting such benefits and rejecting them; and, if, for any reason, he has no practical choice, his acceptance cannot of itself be regarded as amounting to waiver." And in the same volume, sec. 3068, p. 5417, it is held: "Acceptance under practical compulsion. The justice of the rule that acceptance after breach even though a waiver of the right to treat such breach as discharge is not a waiver of a right of action for damages, is especially clear in cases in which the party who is not in default is constrained by his necessities to take what he can get under his contract when he can get it. Such conduct·does not and should not operate as a waiver of the right of action for damages."

A cursory examination of premises, induced by false representations of the agents of another, is con-

sidered no waiver. (*Woodruff v. Day,* 278 Ill. 199, 205; *Gilbey v. Hamlin,* 297 Ill. 258, 263.) In the latter case, the court held: "The plaintiff in error argues that the representations, if proved, were of matters of fact equally open to inquiry by either party, and that in such case the purchaser was bound to make use of his own means of knowledge and use reasonable means to avoid deception, and failing to do so he cannot obtain relief. This is not the law. Where two persons are dealing at arm's length the law does not require that neither shall believe the statements of the other. The rule is that no person who by his fraudulent act has induced another to act to his prejudice can impute negligence to the latter merely because of his reliance upon the former's fraud. (*Leonard v. Springer,* 197 Ill. 532.)"

Defendant in error never having completed its contract, the right of specific performance was not mutual and defendant in error's bill will not lie. (*Barker v. Hauberg,* 325 Ill. 538, 545; *Tryce v. Dittus,* 199 Ill. 189, 199.) In *Barker v. Hauberg, supra,* the court held: "The doctrine is well settled that a contract will not be specifically enforced by the court unless it is mutual,—that is, unless it is of such a character that at the time it was entered into it might have been enforced by either of the parties against the other. Whenever, from personal incapacity, the nature of the contract or any other cause, the contract is incapable of being enforced against one party that party is incapable of enforcing it against the other, though its execution in the latter way might in itself be free from the difficulty attending its execution in the former. (Fry on Specific Performance, sec. 286; Waterman on Specific Performance, sec. 196; 2 Beach on Contracts, 2d ed., sec. 166; *Tryce v. Dittus,* 199 Ill. 189; *Gage v. Cummings,* 209 Ill. 120; *Bauer v. Lumaghi Coal Co.,* 209 Ill. 316; *Ulrey v. Keith,* 237 Ill. 284; *Africani Loan Ass'n v. Carroll,* 267 Ill. 380; *Bartholomae & Roesing*

*Brewing Co. v. Modzelewski,* 269 Ill. 539; *Rutland Marble Co. v. Ripley,* 10 Wall. 339.)''

Plaintiff in error having no remedy by specific performance to complete the hotel building in accordance with the terms of the contract, specific performance will not lie against plaintiff in error. Equity will not specifically enforce a contract that is incomplete or is otherwise vague and indefinite, or because of noncompliance with some condition to be performed, if its terms are not definitely ascertainable. A contract to be specifically performed must be clear and certain. (*Shaver v. Wickwire,* 335 Ill. 46; *Sluka v. Bielicki,* 335 Ill. 202, 209; *Schmidt v. Barr,* 333 Ill. 494, 504; *London v. Doering,* 325 Ill. 593; *Westphal v. Buenger,* 324 Ill. 79.)

A court is without authority to compel a party to do something he did not contract to do. (*Schmidt v. Barr, supra; Cable v. Hoffman,* 273 Ill. 272, 274; *Rampke v. Beuhler,* 203 Ill. 384.)

To entitle a party to specific performance the contract must be clear and certain in its terms and be admitted or proved with a reasonable degree of certainty. (*Westphal v. Buenger,* 324 Ill. 77, 79; *Carson v. Davis,* 171 Ill. 497; *Koch v. National Union Bldg. Ass'n,* 137 Ill. 497.)

An agreement in writing which does not purport to give an absolute right, without further negotiations thereon, cannot be specifically enforced; *Westphal v. Buenger, supra,* page 79, holding: ''To entitle a party to specific performance the contract must be clear and certain in its terms and be admitted or proved with a reasonable degree of certainty. (*Carson v. Davis,* 171 Ill. 497; *Koch v. National Union Building Ass'n,* 137 Ill. 497.) An agreement in writing which does not purport to give an absolute right without further negotiations thereon cannot be specifically

enforced." *Daytona Gables Development Co. v. Glen Flora Inv. Co.,* 345 Ill. 371, 394.

"A contract partly in writing and partly oral is, in legal effect, an oral contract." (*Railway Passenger & Freight Conductors' Mut. Aid. & Benefit Ass'n v. Loomis,* 142 Ill. 560, 567.) That the contract in the case at bar was, in legal effect, an oral contract and required further negotiations to render it a binding contract, is uncertain, indefinite, and by the oral proofs has led to this litigation.

Whatever of force and effect may be conceded to Exhibit "A" and the other negotiations in connection therewith, it must be held as a matter of fact, from all the proofs in the case, that the change in the building plans, of September 25, 1924, after October 29, 1924, without any notice to the Perrys, and the cutting down of the building construction and "paring it to the marrow," together with the failure to keep or to furnish a check and count of the material and labor that went into the hotel building, constitutes on the part of the defendants to the cross-bill of plaintiff in error such an attempt at overreaching, nondisclosure of facts, trickery and fraud, as would prevent the granting of the remedy of specific performance. (*Hetfield v. Willey,* 105 Ill. 286, 290; *Koch v. Streuter,* 232 Ill. 594, 605; *Godwin v. Springer,* 233 Ill. 229, 241; *People v. Gilmore,* 345 Ill. 28, 46.) In *Koch v. Streuter, supra,* the court held at page 605: "Courts of equity will not lend their aid to assist one in realizing upon an unconscionable bargain, even though the contract under which it is claimed possesses all technical requirements. (*Frisby v. Ballance,* 4 Scam. 287; *McCabe v. Crosier,* 69 Ill. 501; *Bowman v. Cunningham,* 78 Ill. 48.) In a note to section 1405 of 3 Pomeroy's Equity it is said: 'If, then, the contract itself is unfair, one-sided, unjust, unconscionable or affected by any other inequitable feature, or if its enforcement

would be oppressive or hard on the defendant or would prevent his enjoyment of his own rights or would work any injustice, or if the plaintiff has obtained it by sharp and unscrupulous practices, by overreaching, by trickery, by taking undue advantage of his position, by nondisclosure of material facts, or by any other unconscientious means, then a specific performance will be refused.' In support of the foregoing familiar rule many authorities are cited, several of which are decisions of this court, which fully sustain the note. In no view can appellant maintain a bill for specific performance of this contract.''

In *People v. Gilmore, supra,* the court held at page 46: ''Fraud includes anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture. (Bishop's Equity, 206.) If fraud be proved it vitiates all transactions touched by it, and it would be a strange anomaly in the law to say in a proceeding to scrutinize the conduct of an attorney procuring a judgment, that because such a judgment had been procured, however fraudulently, proof of facts showing such fraud could not be made.''

In *Godwin v. Springer, supra,* it was held: ''It is the settled doctrine in this State that a party cannot, as a matter of right, have a contract specifically enforced in equity, but that the exercise of this power rests in the sound discretion of the court, in view of the terms of the contract and the surrounding circumstances. *East St. Louis Railway Co. v. City of East St. Louis,* 182 Ill. 433, and cases there cited.''

That there can be no misunderstanding as to what the purported contract was, defendant in error alleged in its original bill: That the final working plans of

said hotel, as to "matters of detail, were approved by E. O. and E. S. Perry." The sworn answers of defendants in error, M. F. Dunlap and T. C. MacVicar, show further what the defendant in error understood the final working plans to be. The witness MacVicar called the plans of September 25, 1924, "The working drawings." The sworn answers formally state that E. S. Perry obtained a copy of Exhibit "N," and after examining the same approved it, as he did by his letter of October 29, 1924. It cannot be contended that the approval of these plans by the Perrys was informal and not intended as an act contemplated under the terms of the contract, and which we have held was the completed contract between the parties. The record further discloses, without contradiction, that long prior to the preparation by defendant in error of any lease and long prior to the tender of the same to the Perrys, the plaintiff in error through his attorneys very clearly indicated that it would refuse to execute any lease based upon the purported value of four hun-dred thousand dollars. This was in the form of a letter addressed to M. F. Dunlap, dated March 11, 1926, which among other things stated:

"An examination of the plans and the contract discloses such wide differences between the building contemplated and the building actually erected that a lease of the kind specified cannot be justly based upon the specifications for the payment of rents, the reason being that the lessee would get a hotel with fewer rooms, inferior construction which would result in greater expense of maintenance, excessive insurance charges and general lack of compliance with the plans upon which the rental was to be based.

"If the Jacksonville Hotel Company desires to negotiate a lease to the Dunlap Hotel Company the Messrs. Perry are willing to negotiate such a lease and agree to pay a fair rental therefor, taking into

consideration the difference between what the contract provides they should have and the building actually erected, but they are unwilling to pay a rental on a valuation of $400,000 at the rate specified inasmuch as the express provisions of the contract require the erection of a building in substantial accordance with the plans referred to and limit the rental charge thereon to a valuation of not to exceed $400,000 without express authorization of additions thereto."

For the reasons stated, the decree of the circuit court of Sangamon county is reversed and the cause remanded with directions to dismiss the bill of complaint of the Jacksonville Hotel Company, defendant in error, for want of equity.

It appearing that the court below in the original decree did not dispose of the cross-bill, answers and replication of the Dunlap Hotel Company, plaintiff in error, the cross-bill, the answers thereto, replication and proofs are remanded to said court with directions to dispose of the same in accordance with the views and findings set out in this opinion.

*Reversed and remanded with directions.*